# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 2480 | **DATE** | 3/13/2000 |
| **CASE TITLE** | | Michael Milano vs. USA | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to limit recovery available to Plaintiff (doc. No. 18-1 and 2) is denied. Defendant's motion for leave to file a third party complaint against Dr. Levin is denied. Plaintiff's motion to bar (Doc. No. 13-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | MAR 14 2000 | date docketed | | 31 |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | 3/13/2000 | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | | ETV | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

MAR 1 4 2000

MICHAEL MILANO,        )
                                )
          Plaintiff,    )
                                )
       v.                )    No. 97 C 2480
                                )
UNITED STATES OF AMERICA,   )    Judge Rebecca R. Pallmeyer
                                )
          Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Milano brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 after injuring his back in a 1995 collision with a United States Postal Service vehicle. Following two unsuccessful surgeries, Plaintiff claims he is unable to return to work as a truck driver. In an administrative claim, Milano claimed $500,000 in damages; in this lawsuit, he seeks recovery in excess of $4 million. On the eve of the original trial date set by this court for May 1999, the United States sought leave to file a third party medical malpractice complaint against Plaintiff's neurosurgeon, Dr. Marc A. Levin, based on the testimony of Defendant's expert witness, Dr. Richard Penn.

Before this court are three motions. First, Defendant moves to limit the recovery available to the amount set forth in Plaintiff's administrative claim, $500,000. Plaintiff contends the increase in his claim for damages is warranted because his need for a second lumbar laminectomy and a spinal fusion, and his inability to return to work as a truck driver, were unforeseeable when he filed his administrative claim. Second, Plaintiff moves to bar the testimony of the government's expert witness, Dr. Penn, that Dr. Levin should not have

performed the lumbar laminectomy on Plaintiff because the surgery was neither reasonable nor necessary. Finally, Defendant moves for leave to file a third party complaint against Plaintiff's physician, Dr. Levin, for the alleged negligent medical treatment of Plaintiff. Plaintiff objects to this third-party suit and seeks to bar testimony regarding his physician's alleged malpractice. For the reasons stated below, Defendant's motion to limit Plaintiff's claim for damages is denied without prejudice. Defendant's motion for leave to file a third party complaint is denied, and Plaintiff's motion to bar the testimony of Defendant's expert is denied.

## BACKGROUND

On June 30, 1995, an employee of the United States Postal Service driving a semi-tractor trailer struck Plaintiff's truck from the rear. (Final Pretrial Order ¶¶ 7-8.) Plaintiff submitted an administrative claim to the United States Postal Service on May 24, 1996, seeking $500,000 in damages. (Compl. ¶ 11.) In his administrative claim, Plaintiff described his injury as "[n]eck and low back injury with herniated discs at L4-L5 and L5-S1 disc spaces requiring future surgery." (Claim for Damage, Injury, or Death, copy attached to Final Pretrial Order.)

As of December 10, 1996, six months after the government received Plaintiff's administrative claim, the United States Postal Service had neither accepted nor rejected the claim.[1] (Compl. ¶ 11.) As authorized by 28 U.S.C. § 2675(a), Plaintiff considered the Postal

---

[1]     Section 2675(a) of the Federal Tort Claims Act ("FTCA") provides that "The failure of an agency to make final disposition of a claim within six months after it is filed (continued...)

Service's inaction to be a denial of his claim and instituted this action pursuant to section 2675(b) of the Federal Tort Claims Act ("FTCA"). (Compl. ¶ 11.) As noted above, Plaintiff's administrative claim sought $500,000 in damages. In his original complaint filed with this court on April 10, 1997, Plaintiff claimed damages in the amount of $750,000. Plaintiff now seeks to increase the *ad damnum* to $4,375,000. (Plaintiff's Motion to Increase Ad Damnum, Ex. B to Final Pretrial Order, ¶ 15.)

Plaintiff filed his administrative claim almost one full year after the accident. At the time he filed his claim, Plaintiff alleges, he "had no reason to believe he would become completely disabled as a result of this accident." (Plaintiff's Response to Motion of Defendant to Limit Recovery (hereinafter "Pl.'s Response"), at 5.) Shortly after the accident, Plaintiff's treating physician, Dr. Chand, ordered an MRI, which revealed that Plaintiff suffered from "a midline L4 disc herniation. . . ." (Defendant's Reply to Plaintiff's Response to Defendant's Motion to Limit Recovery (hereinafter "Def.'s Reply"), Ex. 5.) Dr. Chand recommended conservative therapy. (*Id.*) Because conservative treatment failed to relieve his symptoms, however, Dr. Chand next recommended that Plaintiff see Dr. Marc Levin, a neurological surgeon. (*Id.*) In February of 1996, Dr. Levin conducted further tests, including a myelogram and a CT scan. (*Id.*) These tests confirmed Dr. Chand's earlier diagnosis that Plaintiff suffered from a herniated disk at the L4 level; further, they revealed a disc herniation at the

---

(...continued)
shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." 28 U.S.C. § 2675(a).

L5 level. (*Id.*) Dr. Levin recommended lumbar laminectomy surgery to remove the herniated disks. (Levin Dep., Ex. D to Pl's Response, at 12.)

The goal of this first surgery was to relieve Plaintiff's back and lower extremity pain. (*Id.* at 13.) Dr. Levin testified that he discussed the need for surgery with Plaintiff on two separate occasions, including the "risks, complications, prognosis and other options for treatment." (Def.'s Reply, Ex. 5.) Dr. Levin testified that "the lumbar laminectomy success rates are anywhere from probably 75 percent to 98 percent." (Levin Dep., at 14.) He explained, however, that there is "an incident of five percent of people [who], once they're operated on, have recurrent disk herniations at the same levels." (*Id.*) Dr. Levin further testified that the surgery sometimes is unsuccessful because nerve damage involves "factors sometimes we don't understand or can't understand." (*Id.* at 14-15.) Plaintiff acknowledges this testimony, but points out that "Levin did not say that he told Mr. Milano of the possibility of reherniation, or that he expected Mr. Milano to fall within that five percent [of people who suffer from reherniation], or that there was any reason to believe or anticipate that Mr. Milano would have anything other than a successful recovery." (Pl.'s Response, at 4.) Further, Plaintiff asserts that "[t]o Mr. Milano's knowledge, he was to undergo relatively routine surgery and expected to get better and go back to work." (*Id.*)

In July of 1996, shortly after Plaintiff filed his administrative claim, he underwent his first lumbar laminectomy; the surgery yielded only a brief respite from his pain. (Levin Dep., at 19.) According to Plaintiff, within "[a]pproximately two months after the first surgery, the symptoms came back." (Milano Dep. at 32, summary attached as Plaintiff's Exhibit 2A

4

to Final Pretrial Order.) Postoperative tests, performed in November of 1996, showed "most likely that there was recurrent disk herniations at central, at L5, and to the left at L4." (Levin Dep., at 19.) Plaintiff showed signs of "an extruded disk, which is worse than a herniated disk." (*Id.* at 46.)

In April of 1997, Plaintiff filed this suit, seeking recovery of $750,000. (Compl. ¶ 12.) Plaintiff's complaint alleged that since the time of the administrative filing, he had discovered evidence regarding his medical condition that was not reasonably discoverable at the time of presenting the claim. (*Id.*) Defendant filed its Answer with this court on June 12, 1997. Plaintiff observes that discovery, including the production of Plaintiff's medical records from the first lumbar laminectomy, was complete by July of 1997. (Plaintiff's Response and Objection to Defendant's Motion to File Third Party Company Against Marc Levin, M.D., at 5.) Defendant maintains, however, that it did not receive Plaintiff's "numerous MRIs, CT scans and x-rays . . . including the MRIs and x-rays relevant to the first surgery – until some time around November, 1998." (Defendant's Reply to Plaintiff's Response to Defendant's Motion to File Third Party Complaint (hereinafter, "Third Party Reply") ¶ 2(b).)

After filing his complaint, Plaintiff underwent a second lumbar laminectomy in May 1997. (Levin Dep. at 23.) A July 1997 MRI scan revealed "a lot of scar tissue and degenerated disks at L4 and L5." (*Id.* at 24.) Dr. Levin testified that the degenerative disk problems revealed in the July 1997 MRI were "a result basically of the surgeries that he's gone through." (*Id.* at 33.) Plaintiff testified that "[a]fter the May 1997 surgery, it was around July before I started feeling as bad as I used too [sic]." (Milano Dep., at 34.)

5

In November 1997, Plaintiff saw Dr. Michael Haak at his health insurer's request. Dr. Haak recommended that Plaintiff undergo a third surgery, a lumbar fusion. (Levin Dep., at 24.) Dr. Levin testified that he agreed with Dr. Haak's recommendation for a third surgery. (*Id.* at 26.) Dr. Levin explained that the indications for this third surgery differed from the indications for the first two surgeries. (Levin Telephone Dep. on 3/8/99, attached to Pl.'s Response, at 43.) Dr. Levin considered "number one, he is still having problems and pain with his lower back and his legs. Number two . . . he has scar tissue, he still has nerve root compression and he also has degenerated disks at the L4 and L5 areas. And on the basis of the fact he's had two previous operations, that alone would indicate that he has some lumbar instability and also with the two previous diskectomies." (*Id.* at 43.) This third surgery is more involved and has more risks associated with it than the first two. (*Id.*) "We have to decompress the whole area, remove the bone over the dura and the nerve roots, and remove the disks at L4 and L5, do interbody fusions at L4 and L5, that means fusing the disk spaces themselves and the also putting screws into the vertebral bodies at L4-L5 and the upper portion of the sacrum, and connect those screws to rods. And then also do the lateral fusion laterally to the screws over the transverse processes." (*Id.* at 44.) In light of his doctors' recommendations for additional surgery and his continuing pain and disability, Plaintiff now seeks more than $4 million in damages.

Defendant has moved to limit Plaintiff's recovery to the $500,000 he sought in his administrative claim. (Defendant's Motion to Limit Recovery to Amount Stated in the Administrative Claim and to bar Evidence Newly Discovered or Intervening Facts

(hereinafter, "Motion to Limit").) Defendant claims that before Plaintiff filed his administrative claim, Plaintiff knew that he suffered from a herniated disc, (*id.* ¶ 16); knew that surgery could fail to alleviate his pain, (*id.*); and knew that he had a five percent chance of recurrent disc herniation, which would require further surgery. (*Id.*) Defendant urges, further, that Plaintiff's post-operative diagnosis remained the same as his pre-operative diagnosis. (*Id.* ¶ 18.) Plaintiff argues in response that the increase in *ad damnum* is warranted because at the time he filed his claim and his complaint in this court, he did not know that the first surgery would fail, that he would need a second surgery, or that he would ultimately require a spinal fusion. "It was also unknown that the Plaintiff would be totally disabled from his injuries and surgeries and never return to work as a truck driver." (Final Pretrial Order, Pl.'s Ex. B ¶ 13.)

On April 2, 1996, before Plaintiff had undergone any of his surgical procedures, Dr. John Dwyer examined him and issued a report dated April 15, 1996 to Plaintiff's medical insurance provider, Casualty Insurance. (Motion to Limit, Ex. 2.) Dr. Dwyer's report noted Plaintiff's complaints of pain when "sitting, standing, bending and walking," limiting his ability to sleep, and "radiat[ing] down his back to the hips, abdomen, testicles, and pain in the left leg down to his heel." (*Id.*) Dr. Dwyer did not think surgery was recommended. In his view, "[s]urgical intervention could possibly have a contrary effect and disable this patient partially or totally from his normal occupational duties or any other activity, so it is not recommended." (*Id.*) Defendant proposes to offer Dr. Dwyer's report, written before Plaintiff filed his administrative claim, as evidence that at the time he filed, Plaintiff should

have known of the nature and extent of his injuries and is properly limited to the amount sought as damages in that claim.[2]

More than two years after Plaintiff filed this lawsuit, and after discovery was completed, Defendant sought leave to bring a third party complaint against Plaintiff's physician, Dr. Levin, for negligence in treating Plaintiff. (Defendant's Motion for Leave to File Third Party Complaint (hereinafter, "Third Party Motion") ¶1.) Defendant bases its allegation of medical malpractice on the opinion of its expert witness, Richard Penn, M.D. (*Id.* ¶ 5.) During Dr. Penn's deposition on March 19, 1999, Plaintiff's counsel asked the following question: "Do you believe that Dr. Levin deviated from the standard of care for a well-qualified neurosurgeon in treating Mr. Milano?" Dr. Penn responded, "Yes." (Penn Dep., Ex. C to Third Party Reply, at 11.) Dr. Penn also testified, however, that "I did not review this case specifically to find out whether Dr. Levin followed standards of care. What I did review the case for was whether it was reasonable to do surgery in [sic] this patient." (*Id.* at 12.) Furthermore, when asked whether Dr. Levin deviated from the standard of care for a well-qualified neurosurgeon in performing the first surgery, Dr. Penn responded, "I did not review the records to try to look for a full deviation from standard of care in this case. And I said that an argument could be made on both sides of this issue . . . . But the stronger

---

[2]        Plaintiff asks that Dr. Dwyer's report be stricken as irrelevant because there is no evidence that the report was given to Plaintiff before he filed his claim. (Pl.'s Response, at 5.) In response, Defendant contends that "plaintiff can hardly suggest that he had no knowledge of anything in Dr. Dwyer's report since he was the source of essentially all of the information in the report." (Def.'s Reply, at 4.)

argument could be that he didn't use good judgment in operating on this patient [Plaintiff], *which is not the same thing as malpractice.*" (*Id.* at 13, emphasis added.)

In addition to his deposition testimony, Dr. Penn provided a written report for Defendant's counsel. (Motion to Limit, Ex. 2.) Dr. Penn's report of February 7, 1999 indicated that he agreed with Dr. Dwyer's April 1996 report, which concluded that surgery could further disable Plaintiff. (*Id.*)

## DISCUSSION

There are three motions before this court. This court will address each in turn.

I. **Defendant's Motion to Limit Recovery to the Amount Stated in the Administrative Claim and to Bar Evidence of Newly Discovered or Intervening Facts**

Defendant argues that section 2675(b) of the FTCA bars Plaintiff from recovering damages in excess of the $500,000 he sought in his administrative claim. Section 2675(b) provides:

> Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b).

In general, statutes involving "'the Government's consent to be sued must be construed strictly in favor of the sovereign and not enlarge[d] . . . beyond what the language requires.'" *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992) (alterations in original) (citations omitted). By its terms, the FTCA bars actions for damages in excess of the

administrative claim in all but two circumstances: (1) where the plaintiff proves "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency," or (2) where the plaintiff proves "intervening facts." *Lowry v. United States*, 958 F. Supp. 704, 711 (D.Mass. 1997). Plaintiff may seek a larger amount if he meets either of these tests. *Id.* The plaintiff bears the burden of showing that he or she falls within one of these two FTCA exceptions. *See Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990). In determining whether the exception is available, claimants will not be held to a standard that charges them with "knowing what the doctors could not tell [them]." *Fraysier v. United States*, 766 F.2d 478, 481 (11th Cir. 1985). "[W]hether the plaintiff is seeking an increase under the rubric of 'newly discovered evidence' or 'intervening facts,' one of the key issues is foreseeability. If the condition was reasonably foreseeable at the time the claim was filed, an increase will not be allowed. On the other hand, if it was not . . . [then] an increase may be allowed." *Lowry*, 958 F. Supp. at 711. Moreover, in determining whether a plaintiff satisfies one of the two exceptions to the FTCA, the court applies an objective standard. *See Michels v. United States*, 31 F.3d 686, 689 (8th Cir. 1994).

In determining whether Plaintiff Milano may seek an amount in excess of his administrative claim, the court considers, first, whether Plaintiff could have foreseen his need for a second lumbar laminectomy and a spinal fusion. When Plaintiff filed his administrative claim with the United States Postal Service, he knew that he suffered from herniated disks at the L4-L5 levels in his lower back. In addition, as his claim reflects, he knew that his injury would require corrective surgery. It was not until after Plaintiff filed his claim, however, that

he suffered a reherniation of the same disks. Additionally, it was not until after Plaintiff filed his claim that he incurred a build up of scar tissue. Finally, it was not until after Plaintiff filed his claim that a second and a third operation became necessary. In this court's view, these facts, if proven, may constitute intervening facts not reasonably foreseeable at the time Plaintiff filed his administrative claim. Accordingly, Plaintiff is entitled to the opportunity to meet his evidentiary burden of showing that these were indeed intervening facts and that they were not foreseeable.

Second, the court considers whether Plaintiff could have foreseen his inability to return to work as a truck driver. When Plaintiff filed his administrative claim, he knew that he had not been able to return to work as a truck driver since the accident, and indeed suffered from such great pain that he could not sleep for more than a few hours per night. Nevertheless, Dr. Levin offered Plaintiff considerable hope that his life would return to normal given the 75% to 98% success rates of lumbar laminectomies. Plaintiff claims he "expected to get better and go back to work" after the surgery. (Pl.'s Response, at 4.) If this testimony is credible, Plaintiff may meet the burden of proving that the his alleged permanent disability was unforeseeable.

The Eighth Circuit addressed this issue in *Michels*, 31 F.3d 686. There, the plaintiff, who suffered severe injuries to his hip, knee, and ankle, filed a claim for $450,000. *Id.* at 687. Given his injuries, there was a possibility that he could develop arthritis or necrosis, both of which would require future hip surgery. *Id.* Because the plaintiff did not show signs of either arthritis or necrosis when the claim was filed, he did not factor the cost of future surgery into

his administrative claim. *Id.* The plaintiff did, however, ultimately develop these symptoms and the district court awarded $710,000. Affirming, the Eighth Circuit reasoned that "a known injury can worsen in ways not reasonably discoverable by the claimant or his or her treating physician, and . . . such 'newly discovered evidence' or 'intervening facts,' if convincingly proved, can warrant § 2675(b) relief." *Id.* at 688.

The Seventh Circuit has not yet addressed the appropriate construction of § 2675(b) and its exceptions. The Seventh Circuit has observed, though, that the statutory claim requirement of § 2675 is intended to promote government efficiency, but "should also provide for 'more fair and equitable treatment of private individuals and claimants when they deal with the Government . . . .'" *Erxleben v. United States,* 668 F.2d 268, 273 (7th Cir. 1981) (quoting S.Rep. No. 1327, 89th Cong., 2d Sess. 6). Another court in this district, similarly, has cautioned against interpreting § 2675 as a rigid "regulatory checklist" rather than "a framework conducive to the administrative settlement of claims." *Koziol v. United States,* 507 F. Supp. 87, 91 (N.D. Ill. 1981). Notably, the original language of the FTCA made the administrative claims procedures optional; under such a scheme, it made sense to "prevent small claimants who elected to proceed administratively from later 'upping the ante' when the government refused to settle." *Michels,* 31 F.3d at 688. When the Act was amended in 1966 to make the administrative claim procedure mandatory, it became more important to permit exceptions to the claim limit for individuals "who have suffered serious personal injuries the severity of which is both unpredictable and difficult to quantify in dollar terms." *Id.*

Milano's case differs from *Reilly v. United States*, 863 F.2d 149 (1st Cir. 1984), on which Defendant relies. In *Reilly*, parents of a child born with severe brain damage filed a claim for $10 million against the government for a Naval doctor's medical malpractice in delivering their baby. 863 F.2d at 153. After the government denied their claim, the parents brought suit and recovered a total of $11,037,964 in damages at trial. *Id.* at 171. On appeal, the First Circuit held that the district court's award of damages in excess of the administrative claim was "plainly erroneous," where the plaintiffs knew the "global extent of [their child's] injuries and disabilities" at the time they filed the administrative claim. *Id.* In the court's view, "[t]he mere fact that these dread consequences, feared from the beginning, had become more certain does not suffice to brand them 'newly discovered.'" *Id.*

In the case before this court, Plaintiff argues he did not know the full extent of his injury at the time he filed his claim. The evidence may well support the government's contention that Plaintiff knew from the start that his injuries were permanently disabling. Nevertheless, reherniation of the same discs and development of scar tissue requiring additional surgery are potentially intervening facts that may meet the requirements of the § 2675 exception.

Defendant argues for a strict construction of § 2675(b). Under such a construction, "[a] mere showing that the worst case scenario actually materialized falls short of establishing new evidence or intervening facts since the possibility of the worst case scenario occurring was known from the start." (*Id.* ¶ 9.) *See Allgeier v. United States*, 909 F.2d 869, 878 (6th Cir. 1990) (as a statute waiving sovereign immunity, the Federal Torts Claims Act must be

complied with strictly); *and O'Rourke v. Eastern Airlines, Inc.,* 730 F.2d 842, 856 (2nd Cir. 1984) (same). In Defendant's view, because Plaintiff knew before filing his administrative claim that there was a five percent chance of recurrent disk herniation, Plaintiff should have calculated his damages in his administrative claim based on the "worst-case scenario." (Motion to Limit, ¶ 18.) There are risks associated with any surgery, however. Defendant's position would require that Plaintiff base his administrative claim on circumstances with only a five percent likelihood of occurring. In the court's view, this position would require that Plaintiff inflate his claim based on events that are, although arguably foreseeable, highly unlikely. Defendant aptly notes that one of the purposes of the FTCA is "allowing the government to know at all relevant times its maximum possible exposure to liability and make a realistic assessment of the settlement value of the case." (*Id.* ¶ 2.) Requiring that Plaintiff inflate his claim to account for the unlikely "worst-possible scenario," places the government is in no better position to realistically assess the value of the Plaintiff's claim.

The case law cited by Defendant does not defeat this conclusion. In *Lowry v. United States,* 958 F. Supp. 704 (D. Mass. 1997), the court denied an increase in the *ad damnum* clause where the plaintiff claimed that "the diagnosis of the low back herniation and the establishment of the permanent nature of her disability" were either newly discovered evidence or intervening facts. 958 F. Supp. at 719. Unlike Mr. Milano, however, the *Lowry* plaintiff did not subsequently aggravate her injury in any way. The court noted that a medical exam performed before the plaintiff filed her administrative claim "foreshadowed [the] final diagnosis of permanent liability." Slight differences in her EMG tests taken two

years later were not "sufficiently material to constitute either 'newly discovered evidence' or 'intervening facts.'" *Id.* at 721. Moreover, the permanent nature of the *Lowry* plaintiff's disability was foreseeable given that she had been disabled and was collecting Social Security Disability benefits for two years before amending her administrative claim. *Id.* In contrast, Mr. Milano's diagnosis arguably changed since the filing of his administrative claim given that his symptoms now warrant a different surgical procedure, as indicated by both Dr. Haak's and Dr. Levin's recommendations. Unlike plaintiff Lowry, Mr. Milano had only undergone conservative treatment before filing his administrative claim, and had received assurances that the lumbar laminectomy would reduce his pain by 75 to 98 percent.

Similarly, in *Myers v. United States*, 805 F. Supp. 90 (D.N.H. 1992), the plaintiff claimed that he could not reasonably have foreseen the ultimate extent of his injuries, despite his doctor's diagnosis of fractures in his left patella and left tibia, partial tearing of his anterior cruciate ligament ("ACL"), and mild laxity in his knee. *Id.* at 91. The court determined that "[i]n the face of well-documented ACL damage, one surgery, and subsequent ongoing knee problems . . . the court is unable to say that Myers' need for additional surgery was unforeseeable." *Id.* at 92. Contrary to the *Myers* plaintiff, Mr. Milano had yet to undergo any surgery at the time that he filed his administrative claim. Although his back injury was certain and well-documented, the subsequent aggravation of his back injury that required further surgery is a potentially unforeseeable fact.

In *Wardwell v. United States*, 764 F. Supp. 679 (D. Me. 1991), plaintiff prayed for an increase in her *ad damnum* clause because her physician had not done a "thorough

15

assessment" of her permanent impairments until after the filing of the administrative claim. *Id.* The *Wardwell* court characterized this circumstance as "an excellent example of evidence which was reasonably discoverable," 764 F. Supp. at 684; in any event, the damages proved by plaintiff were well below the $250,000 she requested in her administrative claim. If Mr. Milano can prove that his permanent disability was unforeseeable, then this case warrants a different result than suggested by the *dictum* in *Wardwell.*

Finally, *Low v. United States*, 795 F.2d 466 (5th Cir. 1986) is strikingly similar to the *Reilly* case, and likewise distinguishable from this case. In *Low*, the mother of a child disabled during delivery filed an administrative claim indicating that her child suffered from "'cerebral palsy, seizure disorder, blindness, deafness, and mental retardation.'" 795 F.2d at 471. The Fifth Circuit overturned an increase in the *ad damnum* clause because there was no evidence that the child's condition worsened or that other conditions developed: "This is not a case in which the claimant did not know or reasonably could not have known the basic severity of [her child's] handicap." *Id.* Here, however, Mr. Milano potentially developed medical conditions after filing his administrative claim, such as the build up of scar tissue and reherniation of discs, that was unforeseeable.

Finally, Defendant urges the court to deny Plaintiff's request to increase his claim for damages because he delayed in seeking the increase. (Def.'s Reply, at 8.) Notably, Defendant does not claim that Plaintiff's delay in seeking the increase has unduly prejudiced it. Rather, Defendant asks this court to read into the statute a requirement that simply is not there. Defendant argues that "the statute and the case law require him to provide the government

with full notice of its maximum exposure at all relevant times . . . ." (*Id.* at 9.) To the contrary, the plain language of the statute allows for two situations in which the government will potentially face greater liability where a claim is not settled in the administrative process. The FTCA requires a claimant to present an administrative claim to the appropriate Federal agency before commencing suit. 28 U.S.C. § 2675 (a). The statute does *not* require that a claimant amend his claim upon learning of intervening or previously undiscoverable facts. This court will not impose such a burden on claimants where Congress has not.

The court recognizes that the government might more effectively prepare its defense or negotiate a settlement with knowledge that $500,000 is the limit to its potential liability. Nevertheless, the court concludes that the Defendant's motion must be denied for practical reasons. Assuming that Plaintiff fails to meet his burden of showing that his subsequent surgeries were intervening facts within the meaning of the FTCA, Plaintiff still must be allowed to introduce evidence of his surgeries and his inability to work as a truck driver to prove his claimed damages, regardless of the specific amount he seeks. If the evidence reveals that Plaintiff could have foreseen the need for future surgeries or his inability to work, then his claim for damages here will be capped at the amount he sought in his administrative claim, $500,000.

## II.    Defendant's Motion for Leave to File Third Party Complaint

Defendant filed its Motion for Leave to File Third Party Complaint on May 4, 1999, almost three years after it filed its Answer. Therefore, under Federal Rule of Civil Procedure 14(a), Defendant's motion is no longer granted as a matter of right; rather, it is within this

17

court's discretion to grant or deny Defendant's motion. *Highlands Ins. Co. v. Lewis Rail Serv. Co.*, 10 F.3d 1247, 1251 (7th Cir. 1993) (trial court did not abuse its discretion in denying defendant's motion to file a third party complaint where the defendant waited to file his motion until after discovery was completed and where motions for summary judgment were due shortly).

For several reasons, the court concludes Defendant's motion should be denied. The court begins by noting that the motion is untimely. Although Defendant had Plaintiff's medical records in its possession since July of 1997, Defendant waited almost three years after it filed its Answer and after discovery had been completed to file the present motion. Moreover, Defendant's own expert testified that, as of the late date of March 19, 1999, Defendant *still* had not asked him to review Plaintiff's medical records for signs of medical malpractice. Accordingly, Defendant's own expert refused to give an affirmative opinion that Dr. Levin committed malpractice by operating on Plaintiff. Indeed, Defendant's expert opined that Dr. Levin "didn't use good judgment in operating on this patient [Plaintiff], *which is not the same thing as malpractice.*" (Penn Dep., at 13 (emphasis added).) To grant Defendant's motion at this point would unduly prejudice Plaintiff by delaying the proceedings further and by creating an adversarial relationship between Plaintiff and Dr. Levin, a key witness for Plaintiff.

Defendant argues that its motion was timely given the fact that it did not receive Plaintiff's numerous x-rays, MRI reports, and CT reports until November of 1998. Defendant observes that it did not bring this motion earlier because "[a] decision to charge

a doctor with malpractice is a serious one and is not taken lightly by the United States."
(Third Party Motion ¶ 5.) Although Defendant may have not received the x-rays, MRIs and
CTs until November 1998, Plaintiff's written medical records demonstrate such tests were
performed and that such results were available. Defendant knew as of July 1997 that such
records existed and should have sought production of them. Defendant's argument that it
did not receive certain reports until November of 1998 is not an adequate reason for its delay
in filing the present motion.

Defendant's effort to name Dr. Levin as a third party runs into other roadblocks, as
well. First, there is no indication that this court has personal jurisdiction over Dr. Levin, a
resident of Indiana who practices medicine there. Plaintiff sought out Dr. Levin's services
in Indiana. Nor is it clear that the statute of limitations would not bar this claim. Dr. Levin
performed the first lumbar laminectomy, which Defendant alleges was an act of medical
malpractice, in July of 1996, almost four years ago; this court need not assume for
Defendant's benefit that Dr. Levin, if impleaded, would waive such an obvious defense. The
government's motion to assert a third party complaint is denied.

III.    **Plaintiff's Motion to Bar Testimony of Defendant's Expert Dr. Richard Penn**

Finally, Plaintiff moves to bar Defendant's expert witness, Dr. Richard Penn, from
testifying on two issues: (1) whether Plaintiff's first surgery was medically necessary, and (2)
whether Plaintiff should be allowed to seek damages in excess of his administrative claim.
(Plaintiff's Motion to Bar Testimony of Defendant's Expert (hereinafter, "Motion to Bar")
¶¶ 2, 9.) The court notes, first, the potential inconsistency in this testimony: If, as Defendant

suggests, Plaintiff's first surgery was not medically necessary, or even contraindicated, then the court may well draw the conclusion that the harm that flowed from that surgery was an intervening event, not reasonably foreseeable at the time of filing of Plaintiff's claim.

As noted above, the court denies leave to the government to bring malpractice claims against Dr. Levin in this lawsuit. Notably, under Indiana law,[3] Defendant is liable for the full extent of Plaintiff's injuries. In *Edwards v. Sisler*, 691 N.E.2d 1252, 1254 (Ct. App. Ind. 1998), the court recognized the longstanding Indiana doctrine that a tortfeasor is responsible for the negligence of an attending physician in treating the injured party. In *Edwards*, after plaintiff was injured in a traffic accident, the doctor who treated her performed surgery on the wrong leg. Nevertheless the court refused to allow the driver of the car that hit plaintiff to raise the physician's negligence to reduce his own liability. The court observed, that although plaintiff herself may choose to sue the doctor,

> the plaintiff should not be required to do so, nor should the decision be one made by the defendant. A stranger to the physician-patient relationship should not have a stake in scouring an injured party's medical records searching for some act of malpractice or negligence in order to extricate himself from all or some portion of the damages to the injured party.

*Id.* at 1255, citing *Holden v. Balko*, 949 F. Supp. 704 (S.D. Ind. 1996). Interpreting Indiana law in *Holden*, District Judge Hamilton had observed that permitting a defendant in a personal

---

[3]     Neither party has addressed the choice of law issue. This court understands it is to apply  Illinois choice of law principles to this action arising out of an injury that occurred in Illinois, *see Richards v. United States*, 369 U.S. 1, 11 (1962). Plaintiff's injury occurred in Illinois but was aggravated in Indiana. Arguably Indiana is "the highest scorer on the 'most significant relationship' test." *See Spinozzi v. I.I.T. Sheraton Corp.*, 174 F.3d 842 (7th Cir. 1999).

injury action to raise the treating physician's negligence would likely cause substantial delay and complications, including "significant, and generally corrosive, effects on the relationships between injured persons and . . . doctors, . . . ." 949 F. Supp. at 710.

In Illinois, the picture may be more complicated. In *Gertz v. Campbell*, 55 Ill 2d 84, 302 N.E.2d 40 (1973), the plaintiff's leg was injured in a traffic accident and he filed suit against the driver who hit him. Defendant driver filed a third party action against the doctor who treated the plaintiff in the emergency room and allegedly delayed in performing surgery that would have saved the leg. The court noted the common law understanding that, as in Indiana, an Illinois plaintiff injured as a result of negligence can recover from the tortfeasor not only for the original injury but also for any aggravation caused by a doctor's malpractice, so long as plaintiff exercised ordinary care in selecting the doctor. 55 Ill.2d at 88, 302 N.E.2d at 43. In order to spare the defendant from bearing the expense caused by the doctor's conduct, the *Gertz* court recognized the defendant's right to seek recovery from the doctor for the damages attributable to the doctor's negligence.

Illinois courts continue to adhere to the principle that a tortfeasor is liable for both his acts and the losses resulting from a doctor's negligence. *See Patton v. Carbondale Clinic*, 161 Ill.2d 357, 641 N.E.2d 427 (1994); *cf. Holton v. Memorial Hospital*, 176 Ill.2d 95, 132, 679 N.E.2d 1202, 1219 (1997) (if there were evidence that the injury was aggravated by the doctor's negligence, "the original tortfeasor presumably could be found liable for the damages caused not only by the initial injury to the spine but also for the subsequent failure on the

part of the health care providers to detect and correct the condition."). [4] In light of this principle, the court is uncertain what value there will be to the government in offering evidence of Dr. Levin's alleged negligence. Nevertheless, the court sees no prejudice to Plaintiff from such evidence and believes it may well shed light on the issue of whether Dr. Levin's treatment of Plaintiff constitutes an intervening fact for purposes of the increase in his damages claim. The court therefore denies Plaintiff's request that Dr. Penn be barred from testifying as to the medical necessity of Plaintiff's first surgery.

Notably, Plaintiff does not object to Dr. Penn's testifying as to his disability, need for future surgery, or permanent disabilities. (Plaintiff's Reply to Defendant's Response to Motion to Bar ¶ 3.) Nor does Plaintiff object to Dr. Penn's qualifications as an expert witness. (Final Pretrial Order, at 4.) The court concludes that the motion to bar Dr. Penn's testimony should be denied.

## CONCLUSION

Defendant's motion to limit recovery available to Plaintiff (Doc. 18-1, -2) is denied.

---

[4]     Whether the courts would permit a tortfeasor to seek contribution from an allegedly negligent physician is far less clear. At least some courts have concluded that the adoption of the Joint Tortfeasor Contribution Act in Illinois, 740 ILCS 100/1, in 1978 extinguishes the cause of action for equitable apportionment or implied indemnity that had been recognized in *Gertz*. *See Cleggett v. Zapianin*, 187 Ill.App.3d 872, 543 N.E.2d 892 (1st Dist. 1989); *Mayhew Steel Products, Inc. v. Hirschfelder*, 150 Ill.App.3d 328, 501 N.E.2d 904 (5th Dist. 1986). The Illinois Supreme Court has disagreed with the conclusion that the Contribution Act abolished all forms of common law implied indemnity, *see American National Bank and Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 154 Ill.2d 347, 609 N.E.2d 285 (1992), noting that such a cause of action is certainly available where a principal is held vicariously liable for the conduct of its agent. In light of the conclusions reached with respect to Defendant's Third Party Motion, the court need not address this difficult question.

Defendant's motion for leave to file a third party complaint against Dr. Levin is denied.

Plaintiff's motion to bar (13-1) is denied.

ENTER:

Dated:   March 13, 2000

REBECCA R. PALLMEYER
United States District Judge